STATE OF NORTH CAROLINA v. JOHN HARDY ROSE

No. 182A92

(Filed 28 January 1994)

1. **Evidence and Witnesses § 217 (NCI4th) — first-degree murder — disposal of body — relevant to premeditation and deliberation — admissible**

   The trial court did not err in a first-degree murder prosecution by admitting evidence that defendant had burned the victim's body a day after killing her. Premeditation and deliberation generally must be established by circumstantial evidence, because both are processes of the mind not ordinarily susceptible to proof by direct evidence; defendant's handling of the body from the time of the killing until the body was finally burned and buried is evidence from which a jury could infer premeditation and deliberation.

   **Am Jur 2d, Evidence §§ 273 et seq.**

STATE v. ROSE

[335 N.C. 301 (1994)]

2. **Evidence and Witnesses § 1694 (NCI4th)— first-degree murder—photographs of victim's body—admissible**

The trial court did not err in a first-degree murder prosecution by admitting enlarged color autopsy photographs of the victim's charred body showing indications of stabbing and strangulation. Although some of the photographs were gruesome, they were relevant to illustrate the testimony of the pathologist and were indeed illustrative of testimony regarding the number and nature of the victim's wounds. They were also admissible on the issue of premeditation and deliberation and were not excessive or duplicative. N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Homicide §§ 417 et seq.**

**Admissibility in evidence of enlarged photographs or photostatic copies. 72 ALR2d 308.**

3. **Homicide § 496 (NCI4th)— first-degree murder—instructions—disposal of body—premeditation and deliberation**

The trial court did not err in a first-degree murder prosecution in instructing the jury that defendant's conduct after the killing could be considered on the question of premeditation and deliberation.

**Am Jur 2d, Homicide § 500.**

4. **Evidence and Witnesses § 3127 (NCI4th)— first-degree murder—hearsay—corroborating testimony—not prejudicial**

There was no prejudice in a first-degree murder prosecution from the admission of testimony that more than fifty people had been interviewed who knew nothing of a relationship between defendant and the victim where the hearsay statements of the fifty people were inadmissible extrajudicial declarations which should not have been used to corroborate the testimony of the victim's best friend that she had never seen the victim socializing with defendant, but there was no prejudice because the testimony supported defendant's theory and his own testimony that he and the victim were engaged in a secret relationship.

**Am Jur 2d, Witnesses §§ 632 et seq.**

**5. Evidence and Witnesses § 740 (NCI4th) — first-degree murder —
Bibles found in victim's apartment — admission not prejudicial**

There was no prejudicial error in a first-degree murder
prosecution from the admission of two Bibles found in the
victim's apartment where the fact that the victim kept two
Bibles in her apartment was not probative of any issue, but
defendant failed to show that the admission of the Bibles was
prejudicial. Evidence of the presence of the Bibles in the vic-
tim's apartment was introduced through photographs of the
apartment to which defendant did not object and defendant
himself points out that after the Bibles were admitted they
were only mentioned once again during the trial when the
victim's sister testified that she had seen the Bibles in the
victim's apartment. N.C.G.S. § 8C-1, Rule 401.

**Am Jur 2d, Appeal and Error §§ 797-801, 803.**

**6. Evidence and Witnesses § 1486 (NCI4th) — first-degree
murder — knives — admissible**

The trial court did not err in a first-degree murder pros-
ecution by admitting into evidence knives taken from defend-
ant's residence where no murder weapon was discovered in
the course of the investigation, the evidence did not produce
a clearly identified murder weapon, a pathologist testified to
the numerous knife wounds the victim had sustained, and de-
fendant introduced another knife which he presented as the
murder weapon. The presence of knives in defendant's apart-
ment was relevant to his possession of the murder weapon
before and after the killing and as part of the circumstantial
evidence to be considered by the jury in evaluating defendant's
statements to law enforcement officers. The probative value
of the knives was not outweighed by the danger of confusing
or misleading the jury or unfair prejudice. N.C.G.S. § 8C-1,
Rule 403.

**Am Jur 2d, Homicide § 414.**

**7. Evidence and Witnesses § 2929 (NCI4th) — murder — confession
containing exculpatory statements — introduced by State — not
bound by exculpatory statements**

The trial court did not err in a murder prosecution by
denying defendant's motion for a directed verdict based on
exculpatory portions of defendant's statements where the State

STATE v. ROSE

[335 N.C. 301 (1994)]

introduced defendant's statements, but also introduced evidence tending to contradict and rebut the exculpatory portions of those statements.

**Am Jur 2d, Witnesses § 625.**

8. **Homicide § 253 (NCI4th)— murder—strangulation—premeditation and deliberation—evidence sufficient**

There was substantial evidence of premeditation and deliberation in a first-degree murder prosecution and thus the trial court did not err by refusing to grant defendant's motion for a directed verdict where defendant contended that evidence of manual strangulation and blows to the victim's body were not sufficient. The evidence showed that, in addition to being strangled, the victim suffered a potentially fatal stab wound to the head which was inflicted with such force as to fracture the skull; there were several other lacerations on the victim's body; and defendant's conduct in handling the body after the murder, including burning and burying it, was also circumstantial evidence from which a jury could infer that this murder was premeditated and deliberate.

**Am Jur 2d, Homicide §§ 437 et seq.**

9. **Homicide § 571 (NCI4th)— first-degree murder—request for instruction on involuntary manslaughter—denied—no error**

The trial court did not err in a first-degree murder prosecution by failing to instruct on the lesser included offense of involuntary manslaughter where there was no evidence to support a verdict of involuntary manslaughter. The physical evidence is inconsistent with an accidental stabbing and, contrary to defendant's assertions, he did not testify to what he now describes as an "unstable and volatile relationship."

**Am Jur 2d, Homicide §§ 525 et seq.**

10. **Homicide § 493 (NCI4th)— first-degree murder—instructions—deliberation—inferred from lack of provocation—no error**

There was no plain error in a first-degree murder prosecution from the trial court's instruction that the jury could infer deliberation from lack of provocation where there was evidence from which the jury could reasonably have concluded that

STATE v. ROSE

[335 N.C. 301 (1994)]

the victim did nothing to provoke defendant and that defendant killed her with premeditation and deliberation.

**Am Jur 2d, Homicide § 500.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

11. **Homicide § 475 (NCI4th) — first-degree murder — instructions — malice — no error**

The trial court did not err in a first-degree murder prosecution by giving the pattern jury instruction on malice where defendant contended that the instruction permitted the jury to find the element of malice based on a theory not supported by the evidence and created the possibility that the jury considered defendant's burning of the victim's body as evidence of depravity of mind. The evidence of numerous stab wounds, including a fatal wound to the head, in conjunction with strangulation supports the instruction, and the trial court specifically instructed the jury to consider defendant's actions before and after the murder with regard to premeditation and deliberation, but gave no such instruction on malice.

**Am Jur 2d, Homicide § 500.**

12. **Homicide § 707 (NCI4th) — first-degree murder — instructions — voluntary manslaughter — no plain error**

There was no plain error in a first-degree murder prosecution where the trial court instructed the jury that it could return a verdict of guilty of voluntary manslaughter based on a defense of imperfect self-defense only if defendant reasonably believed it was necessary to kill in self-defense. The Supreme Court declined to reconsider its decision in *State v. McAvoy*, 331 N.C. 583, and there was no plain error in any event because the jury rejected both voluntary manslaughter and second-degree murder in finding defendant guilty of murder in the first degree.

**Am Jur 2d, Homicide §§ 529 et seq.**

13. **Criminal Law § 500 (NCI4th) — first-degree murder — jury — ten minute deliberation — no error**

The trial court did not err in a first-degree murder prosecution by denying defendant's motions for new trial, that a new jury be impaneled or that a *voir dire* be conducted

of the jury where the jury returned a guilty verdict in ten minutes. The Supreme Court has previously held that the brevity of a jury's deliberation does not entitle a criminal defendant to a new trial on the grounds of juror misconduct and defendant has demonstrated no conduct on the part of the jury that would warrant questioning the brevity of the deliberations in this case. It is intended under N.C.G.S. § 15A-2000 that the same jury should hear both phases of the trial unless the original jury is unable to reconvene and it would not have been proper to conduct a *voir dire* to determine the jury's ability to ignore autopsy photographs during sentencing because the autopsy photographs were properly admitted into evidence during the guilt-innocence phase of the trial and were competent for the jury's consideration during the sentencing phase.

**Am Jur 2d, Trial §§ 1025 et seq.**

14. **Jury § 217 (NCI4th) — first-degree murder — jury selection — opposition to death penalty — challenges for cause — no error**

     A defendant's constitutional rights were not violated in a first-degree murder prosecution where jurors opposed to the death penalty were challenged for cause.

**Am Jur 2d, Jury § 290.**

15. **Evidence and Witnesses § 1218 (NCI4th) — first-degree murder — defendant's statements — admissible**

     The trial court did not err in a first-degree murder prosecution by denying defendant's motion to suppress his statements to officers where the evidence shows that the defendant agreed to talk with law enforcement officers, including going to the Sheriff's Department on several occasions and agreeing to go to Asheville for a polygraph examination; defendant was repeatedly told he was not under arrest and was free to leave at any time; defendant was not handcuffed, nor was his freedom restrained; defendant indicated that he wanted to leave on several occasions and was allowed to leave or was taken home by law enforcement officers; defendant testified that the officers had left his apartment on one occasion when he had asked; and defendant also acknowledged that from prior experience he knew what his rights were and that he had knowingly waived them. *Miranda* warnings were not required, the trial court's findings support the conclusion that

there were "no promises of reward or inducements" nor "threat or suggested threat of violence to persuade or induce the defendant to make the statement," and there is also substantial evidence to support the finding that defendant's mother voluntarily came to Graham County and that she was not acting as an agent of the State.

**Am Jur 2d, Evidence §§ 543 et seq.**

16. **Criminal Law § 1068 (NCI4th)— first-degree murder—capital sentencing hearing—prior crime—hearsay testimony of victim—admissible**

The trial court did not err in a sentencing hearing for first-degree murder by admitting hearsay statements of the victim of an attempted rape in Mississippi where defendant admitted that he was convicted of attempted rape in Mississippi but denied that he committed the offense; defendant related parts of the testimony of the prosecuting witness at his trial in Mississippi in response to questions by his attorney; and the parts of the testimony that defendant chose to testify about were clearly selected to create the inference that defendant was not the assailant in that crime. Defendant having presented an incomplete statement of the witness' testimony, including only those portions favorable to himself, the prosecution was properly allowed to cross-examine defendant on the omitted portions of the witness' testimony. Furthermore, the questions offered appeared to be asked in good faith.

**Am Jur 2d, Criminal Law § 598.**

17. **Criminal Law §§ 1337, 1068 (NCI4th)— first-degree murder— aggravating circumstances—previous conviction of felony involving violence—evidence sufficient**

There was sufficient evidence in a first-degree murder sentencing hearing to submit the aggravating circumstance that defendant had been previously convicted of a felony involving the use or threat of violence where defendant admitted that he had been convicted of attempted rape in Mississippi; admitted that the prosecuting witness in Mississippi had testified that defendant grabbed her around the shoulders; and admitted on cross-examination that the prosecuting witness had testified that defendant threatened to cut her throat at the time of the attempted rape. Moreover, the certified court records

STATE v. ROSE

[335 N.C. 301 (1994)]

from Mississippi were sufficient because attempted rape in Mississippi is a crime involving the use or threat of violence since a conviction for attempted rape requires a direct act towards forcible ravishment. N.C.G.S. § 15A-2000(e)(3).

**Am Jur 2d, Criminal Law §§ 598 et seq.**

18. **Criminal Law § 1337 (NCI4th)— first-degree murder— aggravating circumstances—prior conviction involving violence—attempted rape in Mississippi—peremptory instruction**

The trial court did not err in a first-degree murder sentencing hearing by giving a peremptory instruction that a conviction of attempted rape would constitute a conviction involving the use or threat of violence within the meaning of N.C.G.S. § 15A-2000(e)(3) where defendant had been convicted of attempted rape in Mississippi.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

19. **Criminal Law § 1337 (NCI4th)— first-degree murder— aggravating circumstances—prior conviction involving violence—attempted rape during this murder—no plain error**

There was no plain error in a first-degree murder sentencing hearing where defendant contended that the trial court's instructions erroneously allowed the jury to consider a possible attempted rape of Patricia Stewart, the murder victim in the instant case, as an aggravating circumstance. Defendant based his arguments on the emphasis the prosecutor placed during closing argument on the State's theory that Stewart and defendant had no prior relationship and that defendant killed Stewart during a rape attempt, but that argument was made at the close of the guilt-innocence phase of the trial, the prosecutor made it very clear in the sentencing phase closing argument that submission of this aggravating circumstance was based on defendant's Mississippi conviction for attempted rape, and the trial court instructed the jury that in order to find this aggravating circumstance it had to find that defendant had been *convicted* of attempted rape and that such conviction had to be "based on conduct which occurred before the events out of which this murder arose." N.C.G.S. § 15A-2000(e)(3).

**Am Jur 2d, Criminal Law §§ 598 et seq.**

STATE v. ROSE

[335 N.C. 301 (1994)]

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like — post-Gregg cases. 65 ALR4th 838.**

20. **Criminal Law § 1345 (NCI4th) — first-degree murder — aggravating circumstances — especially heinous, atrocious or cruel — evidence sufficient**

The evidence was sufficient in a first-degree murder prosecution to submit the aggravating circumstance that the killing was especially heinous, atrocious, or cruel where the evidence, taken in the light most favorable to the State, tended to show an extremely brutal attack consisting of multiple stab wounds to the body as well as manual strangulation, either of which could have caused death; defendant somehow gained access to the victim's apartment very late at night after the victim's girlfriend had left and the victim was alone; using the knife he had brought with him, defendant inflicted stab wounds on the victim's right eyebrow and her knee and slit her abdomen for five inches; using the knife or some other blunt instrument, defendant inflicted another wound below the left breast causing puckering of the skin and discoloration; defendant stabbed the victim in the head with such force that he fractured the front side of the skull, caused hemorrhaging to the brain beneath the stab wound, and chipping of a bone at the base of the skull; the pathologist's testimony indicated that the victim would have remained conscious while defendant inflicted the lesser knife wounds on her body, and could have remained so after the blow to the head; and, finally, defendant strangled the victim, taking between four and five minutes to choke her to death. N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Criminal Law §§ 598 et seq.**

21. **Criminal Law § 1343 (NCI4th) — first-degree murder — aggravating circumstances — especially, heinous, atrocious, or cruel — instruction not unconstitutionally vague**

The instruction on the aggravating circumstance that a killing was especially heinous, atrocious, or cruel was not unconstitutionally vague under the Eighth Amendment.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

STATE v. ROSE

[335 N.C. 301 (1994)]

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-Gregg cases. 63 ALR4th 478.

22. **Criminal Law § 874 (NCI4th)— first-degree murder— sentencing—reinstruction—no plain error**

There was no plain error in a first-degree murder sentencing hearing where the jury requested further instruction by submitting to the court the question, "Could we have in writing the wording of mitigating circumstance and/or value or weight?"; the court repeated its instructions on Issue Two which placed the burden on the defendant to prove by a preponderance of the evidence the existence of mitigating circumstances; and defendant argued that the court should have also repeated the instructions on Issue Three regarding the State's burden to prove aggravating circumstances and the weighing of aggravating and mitigating circumstances. The jury resumed its deliberations and made no further request for reinstruction. It seems clear that they understood the trial court's reinstruction and gave it proper application since they found all nine of the submitted nonstatutory mitigating circumstances, although they declined to find any of the three submitted statutory mitigating circumstances.

**Am Jur 2d, Trial § 922.**

23. **Criminal Law § 1351 (NCI4th)— first-degree murder— mitigating circumstances—burden of proof—pattern jury instructions—constitutional**

The pattern jury instruction regarding the burden of proof for finding mitigating circumstances in a capital sentencing proceeding is not unconstitutional.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

24. **Criminal Law § 1327 (NCI4th)— first-degree murder— sentencing—instructions—duty to return death penalty—not unconstitutional**

The pattern jury instruction imposing upon the jury a duty to return a recommendation of death if it finds the mitigating circumstances insufficient to outweigh the aggravating circumstances and that the aggravating circumstances

STATE v. ROSE

[335 N.C. 301 (1994)]

are sufficiently substantial to call for the death penalty is constitutional.

**Am Jur 2d, Trial §§ 888 et seq.**

25. **Criminal Law § 1320 (NCI4th) — first-degree murder — sentencing — instructions — consideration of evidence from guilt phase**

The trial court did not err in a sentencing proceeding for a first-degree murder by instructing the jury that it could consider all of the evidence received during the guilt phase on the sentencing issues, then subsequently instructing the jury that evidence of burning of the body after the murder should not be considered as an especially heinous, atrocious or cruel factor. The instructions are not contradictory when taken as a whole.

**Am Jur 2d, Trial §§ 888 et seq.**

26. **Criminal Law § 1373 (NCI4th) — first-degree murder — death sentence — not disproportionate**

A sentence of death for first-degree murder was upheld where the evidence supports the jury's finding of each aggravating circumstance, there is nothing in the record that suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and the sentence was not disproportionate.

**Am Jur 2d, Criminal Law § 628.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Allen (C. Walter), J., at the 4 May 1992 Criminal Session of Superior Court, Haywood County. Heard in the Supreme Court 15 September 1993.

*Michael F. Easley, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*Michael W. Patrick for defendant-appellant.*

FRYE, Justice.

On 4 February 1991 a Graham County grand jury indicted defendant for the murder of Patricia Stewart. Prior to trial, venue was changed to Haywood County. In a capital trial, the jury re-

turned a verdict of guilty of first-degree murder. After a sentencing proceeding held pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court imposed a sentence of death. Defendant gave oral notice of appeal on 12 May 1992. An order staying execution was entered by this Court on 15 May 1992.

Defendant brings forward numerous assignments of error. After a careful review of the record, transcript, briefs and oral arguments of counsel, we conclude that the guilt and sentencing phases of defendant's trial were free from prejudicial error, and that the sentence of death is not disproportionate.

The State presented evidence tending to show the following facts and circumstances. On 6 January 1991, the Graham County Sheriff's Department received a missing person's report regarding the victim, Patricia Stewart. Stewart had last been seen just after 2:00 a.m. on 3 January 1991 by a friend who had been with Stewart at her apartment. A co-worker with whom the victim rode to and from work had dropped the victim off at her apartment after work at approximately 11:30 p.m. on 2 January 1991. The victim failed to appear when she was to be picked up on the afternoon of 3 January 1991.

Deputy Sheriff Jerry Crisp conducted a visual inspection of Stewart's apartment on 6 January 1991 and found everything neat and clean except that the bed linen was missing from the bed. He then conducted interviews with other tenants in the apartment building, including defendant who lived with his sister and her boyfriend in the apartment above the victim. Defendant told Crisp that he knew the victim, but only in passing. Defendant also said that he had been at home all night on 2 January 1991, and had heard no disturbance in the apartment below. Crisp then prepared a missing person's report.

On 10 January 1991, SBI agents searched Stewart's apartment and observed small drops of blood on the venetian blinds behind the bed in the bedroom, on the headboard, on the bed itself, on the carpet and on some of the walls in the bedroom area. Blood was also found on a brass hatrack in the doorway leading from the living room to the dining room and on the door frame. Samples and scrapings were taken of the blood. SBI agents also discovered a broken fingernail on the apartment porch and a small piece of fingernail by the bedroom door.

STATE v. ROSE

[335 N.C. 301 (1994)]

SBI Agent Kevin West testified that he interviewed defendant on 10 January 1991 and defendant stated that he did not know Patricia Stewart at all, but then changed his statement and said that he had met her at a party. Defendant stated he only knew Stewart in passing and did not know anything about her disappearance, other than rumors he had heard in the community.

On 12 January 1991 defendant agreed to be interviewed at the Sheriff's Department. Defendant told Deputy Crisp he had been seeing Stewart discreetly and having sexual relations with her and had been in her apartment a few times. He stated he first became involved with Stewart about a month earlier and had last seen her on Tuesday, 1 January 1991. At that time they were in Stewart's apartment together for two hours, where they had sex and drank some wine. Defendant stated that he stayed in his apartment on 2 and 3 January, and that his sister and her boyfriend did not know about defendant's involvement with Stewart. Crisp testified that he interviewed over fifty people and no one was aware of any relationship between defendant and Stewart.

SBI Agent Tom Frye testified to several subsequent interviews with defendant. On 13 January, defendant stated that he had moved to the area approximately two months prior to the interview, and had moved in with his sister and her boyfriend. Defendant stated he met Stewart at a party and she later asked him to come by sometime and see her. He had sex with Stewart three or four times. Defendant stated that the last time he saw Stewart was on the 2nd of January and that Stewart's girlfriend had come to visit her. After the girlfriend left, defendant went into the apartment and had sex with Stewart. He then returned home and did not go anywhere else that night.

On 13 January, SBI Agent Charles Moody conducted a consent search of the apartment where defendant lived. Four knives were seized from defendant's apartment. Agent Mark Nelson performed a consent search of an automobile owned by defendant, a blue Pontiac, and one owned by his sister, a yellow Ford, both of which contained items which tested positive for blood. Nelson discovered a pair of numchucks in defendant's car which tested positive for blood. A tire tool, jumper cables and a thermos from the trunk of defendant's sister's car tested positive as well. Bloodstains were also found in the trunk of that car and a black sleeveless jacket in the back seat revealed the presence of blood. Bloodstains from

the thermos and from the Ford trunk were consistent with the victim's blood type and inconsistent with the blood type of defendant.

On 14 January, SBI Agent Frye discussed with defendant the results of the searches of defendant's apartment and the two automobiles. Defendant stated that he did not want to talk about Stewart's disappearance because the situation surrounding it was too bad to talk about, and he was concerned about what his family would think of him. Defendant did tell officers that "the disposition of Patricia Stewart was so bad" that they would not be able to find any of the remains. Defendant also later stated that he went to Stewart's apartment late on 2 January after drinking liquor. He stated he used his sister and her boyfriend's automobile without their knowledge.

On 15 January 1991, officers searched defendant's grandmother's farm and found what appeared to be a grave near the bottom of a hill. After removing a stone, Agent Moody observed what appeared to be human skin underneath the stone. A photograph was taken and the human remains were exhumed. Tests performed on soil samples taken from the grave site revealed that the soil contained residual gasoline. Officers returned to the farm on 16 January to continue their search. A hoe was found beside the residence steps and a pair of women's panties and several items of bed linen were found in a creek on the property. Investigators also located a small pink bag, commonly called a "fanny pack," filled with various items, including a lipstick tube, a pair of black gloves, an address book and a calendar. The fanny pack also contained a savings account book bearing the name of Patricia L. Stewart, a small brown compact, a make-up brush, a small jewel case, some chewing gum, a set of keys, a folding blade knife and a billfold. Agent Moody testified that the officers found a piece of fabric about two feet away from the grave site and two plastic wire ties which were beneath the fanny pack.

On 15 January, agents also spoke again with defendant, this time in the presence of his mother. His mother told defendant that if he was involved with Stewart's disappearance or had any knowledge about it, he needed to tell about it. Defendant informed the agents that Stewart's body was located at his grandmother's farm. Agent Frye radioed this information to officers searching for the victim's body, but was informed that the body had been found.

At this point defendant was arrested and given *Miranda* warnings for the first time. Defendant waived his rights and gave an additional statement in which he said he had a relationship with Stewart which Stewart kept secret. He stated that he was in Stewart's apartment after midnight on Wednesday, 2 January. He was there before Stewart's girlfriend arrived and Stewart asked him to leave and come back later which he did. Defendant stated that he had drunk a quart of whiskey and smoked a lot of pot before going to Stewart's apartment. He stated that he went to the apartment to tell Stewart that he was going back to his girlfriend in Alabama and Stewart told him he could not go. Stewart told him he was her secret lover and that she would have him arrested for rape if he tried to leave. Defendant said he had a knife, that he just went crazy and beat her and choked her. Defendant then wrapped the victim's body in the bed linen and put it in the trunk of his Pontiac, but the car would not start. Defendant stated that after he put Stewart's body in the trunk of his car, he went back inside and tried to clean up. He stated that he took the knife he killed Stewart with back to his apartment, cleaned it and placed it in a box in his bedroom. He left the body in his car through the next day and in the evening borrowed his sister's Ford automobile. He took a gas can and had it filled. He then transferred the body to the trunk of the Ford. He drove the Ford to his grandmother's farm, took the body behind the house, used his grandmother's hoe to dig a shallow grave, poured gasoline on the body, set it afire and walked away. When the fire went out, defendant returned and covered the body with rocks, leaves and tree branches.

Dr. Deborah Radisch, medical examiner, testified that the victim's body showed signs of decomposition and of charring where it had been burned, in some areas down to the muscle. Most of the hair was also burned off. There were several wounds on the victim's body including a half-inch laceration over the right eye. There was a five-inch shallow-incised wound above the waistline and a similar wound on the right knee. Below the left breast there was an area where the skin was puckered and there was a greenish discoloration over the skin of the chest. On the left side of the head, there was an area of defective scalp with a cut through the skull. The skull was fractured and showed areas of bone chipping on the outer surface. The brain below this area showed a small area of bleeding over the surface of the brain and the bone was chipped or fractured at the base of the skull. There was an

area of bleeding in the tissues over the front of the spine in the neck region and in the area behind the esophagus. The lining tissue of the ·upper airway in the area of the vocal chords showed a purple discoloration consistent with blood having collected there. The medical examiner testified that the cause of death was a combination of sharp and blunt injury to the head and strangulation. The medical examiner testified that in her opinion the injuries to the knee, right side of the body, laceration above the eye, left side of the head and puckered area were all inflicted prior to the victim's death. The burns were clearly inflicted after death and were the result of the body or clothing being set afire with some sort of accelerant.

Defendant testified during the guilt phase of the trial that he was at Stewart's apartment on the night of 2 January and that he told her he was going back to Alabama, to which Stewart responded that she would accuse him of rape if he left. Defendant testified that Stewart then reached over to a nightstand beside her bed and picked up a pocket knife that she always had lying there, open. She shook the knife and said, "You ain't going nowhere." Defendant testified that he jumped up, hit Stewart's arm, causing the knife to hit her in the head real hard, and immediately jumped on top of her. Defendant testified that he heard something pop, backed up and saw blood coming out of Stewart's head. Defendant testified that he did not remember choking Stewart that morning and that he did not intend to harm her and did not think anything like that would happen. Defendant testified that he was scared and it just popped in his mind what to do with Stewart's body. He carried Stewart's body out and put it in the trunk of his car with all of her bedclothing. Defendant testified that he returned to the apartment to try to clean up the blood on the floor. He also took the knife and put it in his pocket. The next night he borrowed his sister's car (because his was not running), bought gasoline, and after his sister went to sleep he transferred Stewart's body to her car. He then drove the body to his grandmother's farm where he used a hoe to scratch out a spot in the ground and placed the victim's body in the ground. He then removed her clothes, doused her with gasoline and threw a match on her. He sat down until the fire went out and then tried to cover the body with rocks and leaves. During cross-examination, defendant testified that he had been convicted of attempted rape in Mississippi.

STATE v. ROSE

[335 N.C. 301 (1994)]

Defendant also called a private investigator who testified that he was hired by defendant to search for a knife in a field where defendant said he had thrown it. The investigator stated he found the knife which defendant identified as the one he struck the victim with. The knife was introduced into evidence as one of defendant's exhibits.

On rebuttal, the State recalled Robin Anderson, the victim's sister who had lived with the victim for some time, who testified that she had never seen the knife in her life. Anderson testified that the only two knives that the victim owned were the knife she kept in the kitchen and the one used as a screwdriver. The knife defendant identified did not belong to the victim.

The jury returned a verdict of guilty of murder in the first degree. Following return of the guilty verdict a capital sentencing proceeding was held pursuant to N.C.G.S. § 15A-2000.

At sentencing, the State only introduced exhibits related to defendant's conviction in Mississippi for attempted rape. Defendant testified about his childhood and rearing. He described how in his early years he lived with his alcoholic father who was abusive to defendant's mother and siblings. At the age of twelve, defendant and his sister were left with a relative and told that they were going to be given away. Defendant also described his military service in the United States Marine Corps and the Army from which he received honorable discharges. He also testified that he married when he was eighteen years of age, had three children and later divorced. Defendant's mother and sisters also testified concerning defendant's upbringing. Sheriff's Department employees testified that defendant had been a good prisoner and defendant's employer testified that he was a good employee.

Additional evidence will be discussed as it becomes relevant to a fuller understanding of the specific issues raised on appeal.

GUILT PHASE

[1] Defendant's first three assignments of error address his contention that the trial court erred by admitting evidence that he burned Patricia Stewart's body a day after killing her. Defendant first argues that his conduct in burning the body a day after the killing was not relevant to prove premeditation or deliberation. We disagree.

Premeditation and deliberation generally must be established by circumstantial evidence, because both are processes of the mind not ordinarily susceptible to proof by direct evidence. *State v. Richardson*, 328 N.C. 505, 402 S.E.2d 401 (1991). Among the circumstances to be considered in determining whether a killing was done with premeditation and deliberation is "the conduct and statements of the defendant before and after the killing." *State v. Small*, 328 N.C. 175, 400 S.E.2d 413 (1991). Further, any unseemly conduct towards the corpse of the person slain, or any indignity offered it by the slayer, as well as concealment of the body, are evidence of express malice, and of premeditation and deliberation in the slaying. *State v. Westbrook*, 279 N.C. 18, 181 S.E.2d 572 (1971), *sentence vacated*, 408 U.S. 939, 33 L. Ed. 2d· 761 (1972).

Defendant acknowledges that conduct after a killing may be relevant to prove premeditation or deliberation. He argues however that in the present case his conduct after the killing was not relevant since the evidence suggests that he did not plan to burn the victim's body prior to death, as evidenced by the difficulty he encountered in disposing of the body. To the contrary, the evidence tends to show that the defendant knew that he would have to wait until he could borrow his sister's car to transport the victim's body to his grandmother's farm under the cover of darkness. Defendant's testimony was that he rolled his car around to the back of Stewart's apartment, but that the car would not actually start or run. He placed the body, together with the bedclothes and the victim's personal items, in the trunk of his car. Defendant testified that he then went back into the apartment, took a towel from the victim's bathroom and tried to clean up the blood. He locked the victim's apartment, moved the car back around to his side of the building and returned to his own apartment where he washed his bloody clothes. Defendant testified that he borrowed his sister's car the next afternoon, purchased gasoline in preparation for the fire, and waited until his sister and her boyfriend were asleep before he transferred the body from his car to his sister's car. He then went directly to the deserted farm, dug the grave, inserted the body, poured gasoline onto it, and lit the fire. After the fire went out, he covered the body with brush and rocks and left.

As is often the case, there is no direct evidence here that defendant premeditated and deliberated this murder. In particular, there was no evidence of an overt act by the defendant prior to the killing in preparation for burning and disposing of the body.

There was, however, evidence of an elaborate process of removing the body, bloody bedclothes and personal items from the scene of the killing; cleaning the victim's apartment; hiding the body and other items in one car, transferring them to another car, and when opportunity permitted, transporting them to a remote location and burning and burying the body there. Defendant's handling of the body from the time of the killing until the body was finally burned and buried is evidence from which a jury could infer premeditation and deliberation.

[2] Secondly, defendant argues that the trial court erred in admitting certain enlarged color autopsy photographs of the victim's body. The photographs were of the victim's head, face, and torso showing indications of stabbing, strangulation, and the body's charred condition resulting from its having been burned. Defendant contends that these photographs were gruesome, not relevant on the issue of premeditation and deliberation, and were introduced to inflame the jury. The State argues that the photographs were admissible as illustrative of the pathologist's testimony with regard to the condition of the victim's body and the wounds it had sustained, and were admissible as evidence of defendant's conduct after the murder with regard to the issue of premeditation and deliberation. We agree with the State.

This Court has stated that "[p]hotographs of homicide victims are admissible at trial even if they are 'gory, gruesome, horrible, or revolting, so long as they are used by a witness to illustrate his testimony and so long as an excessive number of photographs are not used solely to arouse the passions of the jury.'" *State v. Thompson*, 328 N.C. 477, 491, 402 S.E.2d 386, 394 (1991) (quoting *State v. Murphy*, 321 N.C. 738, 741, 365 S.E.2d 615, 617 (1988)). "Photographs may also be introduced in a murder trial to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree." *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988).

Admissibile evidence may, however, be excluded under Rule 403 of the North Carolina Rules of Evidence, which states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury,

or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (1992).

> In general, the exclusion of evidence under the balancing test of Rule 403 of the North Carolina Rules of Evidence is within the trial court's sound discretion. *State v. McLaughlin*, 323 N.C. 68, 372 S.E.2d 49 (1988); *State v. Mason*, 315 N.C. 724, 340 S.E.2d 430. Whether the use of photographic evidence is more probative than prejudicial and what constitutes an excessive number of photographs in the light of the illustrative value of each likewise lies within the discretion of the trial court. *State v. Sledge*, 297 N.C. 227, 254 S.E.2d 579.

*Hennis*, 323 N.C. at 285, 372 S.E.2d at 527.

In this case, seven color autopsy photographs were introduced into evidence. Although some of the photographs were gruesome, they were relevant to illustrate the testimony of the pathologist and were indeed illustrative of testimony regarding the number and nature of the victim's wounds. These photographs were therefore admissible. As we have concluded that defendant's handling of the victim's body after the killing was relevant to premeditation and deliberation, the photographs were also admissible on the issue of premeditation and deliberation. The trial court considered a total of nine photographs and, pursuant to Rule 403, sustained defendant's objection to two of them and admitted the other seven. These seven photographs showed the wounds that were actually inflicted upon the victim by defendant. Although the pathologist also illustrated her testimony with two line drawings showing the location of the wounds, the photographs illustrated the nature of each wound. Under the circumstances, these photographs were not excessive or duplicative. While their gruesome nature may have affected the jury, we do not believe that their effect was more prejudicial than probative. We conclude that the trial court did not abuse its discretion in refusing to exclude these photographs.

[3] Defendant further argues that the court erred in instructing the jury that his conduct after the killing could be considered on the question of premeditation and deliberation. As noted above, a defendant's conduct before and after the killing may be relevant to show premeditation and deliberation and was indeed relevant

in this case. Therefore, the trial court did not err in instructing the jury accordingly.

[4]   In defendant's next assignment of error, he contends that the trial court erred in admitting testimony that more than fifty people had been interviewed who knew nothing of his relationship with the victim. Defendant argues that this testimony was inadmissible hearsay. In response to defendant's contention that the killing of Patricia Stewart occurred during the course of a lovers' quarrel, the State questioned Deputy Sheriff Crisp about his investigation into the romantic relationship between Stewart and defendant. Crisp's testimony included the following:

Q: During the course of your investigation, have you ever, during that investigation, turned up any person who said that they knew of any personal relationship between the defendant and Patricia Stewart?

MR. COWARD: Objection.

THE COURT: Overruled.

Crisp: No sir, we specifically looked for that.

Q: How many people in the Robbinsville area approximately were interviewed and questioned as part of this investigation?

Crisp: I myself, interviewed in excess of 50 people, and nobody ever had any knowledge or any mention of them having any type of relationship. Patricia also had a lot of writings in her apartment.

The State agrees with defendant that this testimony was hearsay but argues that the testimony was corroborative in nature and therefore admissible for that purpose.

Angie Colvin, the victim's best friend, testified that she had never seen defendant before in her life, and that she had never seen the victim socializing with defendant. The State contends that Deputy Crisp's testimony regarding the statements of fifty other people corroborated Colvin's testimony.

Otherwise inadmissible hearsay statements may be admitted for corroborative purposes. State v. Locklear, 320 N.C. 754, 761-62, 360 S.E.2d 682, 686 (1987). However, it is not permissible to corroborate a witness' testimony with "extrajudicial declarations of someone other than the witness purportedly being corroborated."

*State v. Hunt*, 324 N.C. 343, 352, 378 S.E.2d 754, 759 (1989) (citing 1 *Brandis on North Carolina Evidence* § 52, at 243 (3d ed. 1988) ). *See also State v. Sherrill*, 99 N.C. App. 540, 543-44, 393 S.E.2d 352, 354, *disc. rev. denied*, 327 N.C. 641, 399 S.E.2d 130 (1990). In this case the hearsay statements of the fifty people were extrajudicial declarations of persons other than Colvin and could not have been used to corroborate her testimony.

Although this testimony was thus not admissible for corroborative purposes, defendant has failed to show how its admission prejudiced him. In fact, Deputy Crisp's testimony that fifty or more people were questioned and none had knowledge of a relationship between defendant and the victim supported defendant's theory and his own testimony that he and the victim were engaged in a secret relationship. Thus, there is no reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988). This assignment of error is rejected.

[5] In another assignment of error, defendant contends the trial court erred by admitting into evidence Bibles found in the victim's apartment because this was impermissible character evidence. Defendant argues that the Bibles, which were removed from the victim's apartment by investigators, were not relevant to any issue in the case. According to defendant, the Bibles were introduced to support the implication that "the victim was a God-fearing Christian who would not have engaged in an illicit romantic relationship with [defendant]." Defendant contends that this amounted to inadmissible character evidence of the victim.

Under Rule 401 of the North Carolina Rules of Evidence, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). The fact that the victim kept two Bibles in her apartment was not probative on any issue in this case. Indeed, the only apparent connection of the Bibles to the case was their presence in the apartment along with all of the other furnishings on the night of the murder. Defendant has failed to show, however, that the admission of the Bibles into evidence was prejudicial. In fact, evidence of the presence of the Bibles in the victim's apartment was introduced through photographs of the apartment, including one that clearly depicted

the Bibles on a bookshelf. Defendant did not object to the introduction of these photographs. Furthermore, defendant himself points out that after the Bibles were admitted they were only mentioned once again during the trial when the victim's sister testified that she had seen the Bibles in the victim's apartment. Thus, we conclude that the admission of the Bibles into evidence did not constitute error prejudicial to defendant. N.C.G.S. § 15A-1443(a) (1988).

[6] In another assignment of error, defendant contends the trial court erred in admitting into evidence knives taken from his residence because they were not relevant to any issue in the case. Defendant further contends that to the extent the knives had any relevance, they should have been excluded under Rule 403. During one of his statements to law enforcement officers, defendant stated that the knife he used to kill Stewart was in his pocket when he first went to her apartment and that, after the killing, he took the knife back to his apartment, cleaned it and placed it in a box in his bedroom. During a subsequent consent search of defendant's apartment, SBI agents discovered four knives. These knives, as well as a photograph of the knives, were admitted into evidence. Defendant objected to the admission of the knives, but did not object to the admission of the photograph. SBI Agent Nelson testified that he tested the knives for blood and that no blood was present on the knives. Defendant testified later in the trial that two of the knives belonged to him but that they had not been used to kill Stewart.

During the course of the investigation into this killing, no murder weapon was discovered. At trial, the State presented such evidence as it had gleaned from the investigation. This consisted, in part, of the pathologist's testimony to the numerous knife wounds the victim had sustained. It also consisted of defendant's statements to law enforcement officers, in one of which defendant indicated that he had taken the knife used to kill Stewart back to his apartment, cleaned it, and put it away in a box. The presence of knives in defendant's apartment was relevant to his possession of the murder weapon before and after the killing and as part of the circumstantial evidence to be considered by the jury in evaluating defendant's statements to law enforcement officers. The knives were therefore relevant and admissible under Rules 401 and 402.

Defendant contends that the knives should nevertheless have been excluded under Rule 403 because their probative value was

"outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury." We disagree. The knives were one of a number of pieces of evidence introduced regarding the weapon used in this homicide. This evidence included a photograph of these same knives, testimony that some of the victim's wounds "would [have been] caused by a sharp cutting instrument," defendant's conflicting statements regarding how he acquired and disposed of the murder weapon, and a fifth knife introduced by defendant which he presented as the murder weapon. This evidence did not produce a clearly identified murder weapon. However, the danger of confusion or unfair prejudice from the admission of these particular knives was minimal considering the admission of a picture of these same knives and another knife produced by defendant. We conclude that the probative value of the knives was not outweighed by the danger of confusing or misleading the jury or unfair prejudice and therefore the trial court did not abuse its discretion under Rule 403 by not excluding the four knives from the evidence. *See* *State v. Thompson*, 332 N.C. 204, 222, 420 S.E.2d 395, 405 (1992).

[7] In another assignment of error, defendant contends that the trial court erred in denying his motion for a directed verdict because the evidence was insufficient to support a conviction of first degree murder. Defendant first argues that by introducing his confession, the State was bound by the exculpatory portions of the confession, establishing that the murder was committed without premeditation and deliberation. Through his confession, defendant stated that on the night of the killing he went to Stewart's apartment to tell her he was breaking off their relationship and returning to Alabama. He stated that Stewart responded by telling him that if he left she would accuse him of rape. Defendant further stated that, upon hearing this, he "went crazy" and "I just killed her; I beat her; I choked her." Defendant now argues that this confession established that he acted in a fit of passion, rather than with premeditation and deliberation.

This Court has stated that:

[w]hen the State introduces into evidence a defendant's confession containing exculpatory statements which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by the exculpatory statements. The introduction by the State of a confession of the defendant which includes such exculpatory statements,

STATE v. ROSE

[335 N.C. 301 (1994)]

however, does not prevent the State from showing facts which contradict the exculpatory statements. The State is not bound by the exculpatory portions of a confession which it introduces if it introduces other evidence tending to contradict or rebut the exculpatory statements of the defendant contained in the confession.

*State v. Williams*, 308 N.C. 47, 66, 301 S.E.2d 335, 347, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983) (citations omitted). Defendant argues that the State introduced no evidence to dispute that part of his confession which indicated that he killed Stewart in a fit of passion after being provoked by her, and without premeditation and deliberation.

In the present case there is evidence tending to contradict the exculpatory portions of defendant's confession. First, the pathologist testified that the stab wound to the head and the strangulation were both fatal and that the stab wound was inflicted before the strangulation. The pathologist also testified that the strangulation would have required four to five minutes of constant pressure. Thus, not only did defendant have time and opportunity to stop between the stabbing and the strangulation, but he also had four to five minutes during the strangulation in which to stop. Contrary to defendant's contention, the evidence of these time frames supports the inference of a killing done with premeditation and deliberation.

There was also evidence to contradict defendant's confession statement that he killed the victim after she provoked him by threatening him with a knife and threatening to accuse him of rape. The victim's half-sister, Robin Anderson, testified that the victim kept her pocket knife on a table in the dryer room, not in the bedroom as defendant stated. Anderson also testified that she had never seen the knife defendant identified at trial as having come from the victim's bedroom, and that it did not belong to the victim. Although defendant stated that the basis of the victim's threat to him was their secret relationship, there was evidence that no such relationship existed. Finally, defendant asserts that the State presented no evidence of a struggle in the apartment. Apart from the fact that defendant stated that he returned to the apartment and cleaned it, the State presented several SBI agents who testified to the presence of blood on the window blinds, the headboard of the bed, the carpet, the wall, a hatrack, and

a doorframe. This evidence supports the inference that the victim did not die without a struggle.

Since the State introduced evidence tending to contradict and rebut the exculpatory portions of defendant's statements, it was not bound by those exculpatory portions. The trial court did not err in denying defendant's motion for a directed verdict based on exculpatory portions of his statements.

[8] Defendant also argues that his motion for a directed verdict should have been granted because evidence of manual strangulation and blows to the victim's body did not provide sufficient evidence of premeditation and deliberation. Defendant argues that in all of this Court's previous first-degree murder cases involving manual strangulation, additional facts were present to show premeditation and deliberation, such as prior threats to the victim or that the strangulation occurred after the victim was bound, abducted, and/or raped. Defendant cites two cases from the state of Washington for the holding that manual strangulation alone is insufficient to establish premeditation and deliberation. *State v. Bingham*, 719 P.2d 109 (Wash. Sup. Ct. 1986); *State v. Bushey*, 731 P.2d 553 (Wash. Ct. App. 1987). We find no error.

A motion for a directed verdict has the same legal effect as a motion for judgment of nonsuit and challenges the sufficiency of the evidence to go to the jury. *State v. Williams*, 307 N.C. 452, 454, 298 S.E.2d 372, 374 (1983). If there is substantial evidence of each essential element of the crime charged, the motion for a directed verdict should be denied. In ruling on this motion, the trial judge must consider the evidence in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn from the evidence. *Id.* at 455, 298 S.E.2d at 374.

In considering whether there was susbstantial evidence of premeditation and deliberation in the instant case to withstand defendant's motion for a directed verdict, we do not have to answer the question whether strangulation alone is insufficient to establish premeditation and deliberation. There was much more evidence here of premeditation and deliberation than the strangulation alone. Premeditation and deliberation may be proved by any relevant evidence including the circumstances and manner ·in which the victim was killed. *State v. Richardson*, 328 N.C. 505, 513-14, 402 S.E.2d 401, 406 (1991). The evidence shows that, in addition to being strangled, the victim suffered a potentially fatal stab wound to

the head which was inflicted with such force as to fracture the skull. There were several other lacerations on the victim's body. As we have already concluded, defendant's conduct in handling the body after the murder, including burning and burying it, was also circumstantial evidence from which a jury could infer that this murder was premeditated and deliberate. We conclude that there was substantial evidence of premeditation and deliberation and thus the trial court did not err by refusing to grant defendant's motion for a directed verdict.

[9]  In his next assignment of error, defendant contends the trial court erred in denying his request for a jury instruction on the lesser included offense of involuntary manslaughter. The jury was instructed that it could return a verdict of first degree murder, second degree murder, voluntary manslaughter, or not guilty.

Involuntary manslaughter is "the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." *State v. Wingard*, 317 N.C. 590, 600, 346 S.E.2d 638, 645 (1986) (quoting *State v. Hill*, 311 N.C. 465, 471, 319 S.E.2d 163, 167 (1984)). Defendant argues that his evidence showed that he and his victim had "an unstable and volatile relationship," that he was intoxicated from drinking and smoking pot on the night in question, and that these conditions triggered a conflict that led to his killing Stewart. Defendant also relies on his testimony that the initial stabbing was accidental and that he did not recall strangling the victim. This evidence, he asserts, supported an instruction on involuntary manslaughter. We disagree.

Contrary to defendant's assertions, he did not testify to what he now describes as an "unstable and volatile relationship." Defendant's testimony was that he visited Stewart at her apartment eight or nine times over the course of a month and that they engaged in "conversation, sex [and had supper] a few times." Further, the physical evidence is inconsistent with an accidental stabbing. The uncontroverted evidence was that there were four wounds to the victim's body and one wound to the head which was inflicted with enough force to pierce the skull and was potentially fatal. Defendant's testimony that he could not recall strangling the victim is not substantial evidence in light of the physical evidence and pathologist's testimony that the victim was in fact strangled. "It

is well settled that a jury should only be instructed with regard to a possible verdict if there is evidence to support it." *State v. Clark*, 325 N.C. 677, 684, 386 S.E.2d 191, 195 (1989). Here there was no evidence to support a verdict of involuntary manslaughter and the trial court did not err in failing to instruct on this lesser included offense.

[10]    In another assignment of error, defendant contends that the trial court erred in instructing the jury on premeditation and deliberation by telling the jury that it could infer deliberation from "lack of provocation." Defendant argues that this instruction was erroneous because (1) it was not supported by the evidence, (2) it allowed the jury to convict based on a lack of evidence regarding whether or not the victim provoked the killing, and (3) it relieved the State of its constitutional burden of proving every element of the crime beyond a reasonable doubt. The trial court instructed the jury as follows:

> Neither premeditation nor deliberation are usually susceptible of direct proof. They may be proven by circumstances from which they may be inferred, such as the lack of provocation by the victim; the conduct of the defendant before, during and after the killing; the circumstances of the killing; the manner in which and the means by which the killing was done.

Because defendant did not object to the instruction at trial, we review this assignment of error under the plain error rule. Under the plain error rule, defendant must convince this Court not only that there was error, but that the error was so substantial that absent the error, the jury probably would have reached a different verdict. *State v. Faison*, 330 N.C. 347, 361, 411 S.E.2d 143, 151 (1991).

We have stated that:

> [t]he examples listed in the above instruction, which is taken directly from the North Carolina Pattern Jury Instructions, N.C.P.I.—Crim. 206.13 (1989), "are merely examples of circumstances which, if found, the jury could use to infer premeditation and deliberation. It is not required that each of the listed elements be proven beyond a reasonable doubt before the jury may infer premeditation and deliberation." *State v. Cummings*, 326 N.C. 298, 315, 389 S.E.2d 66, 76 (1990). However, when the trial judge focuses his instruction upon one or more of such elements as circumstantial proof of premeditation and

deliberation, those focused upon must be supported by competent evidence. *State v. McDowell*, 329 N.C. 363, 388, 407 S.E.2d 200, 214 (1991).

*State v. Thomas*, 332 N.C. 544, 563, 423 S.E.2d 75, 86 (1992).

In the present case, defendant testified that he and the victim had an intimate relationship. He testified that on the night of the murder he told the victim that he was leaving to go back to Alabama and that, in response, the victim picked up a pocket knife that she always had on her nightstand, shook it at him and said, "you ain't going nowhere." Defendant also testified that the victim threatened to accuse him of rape if he left her. This version of the events that took place was contradicted by evidence that the victim did not keep a knife in her bedroom on the nightstand and that the knife defendant identified as having been in the bedroom did not belong to the victim. There was also evidence that there was no relationship between the victim and defendant which according to defendant formed the basis of the provocation. Notwithstanding the defendant's statements to the contrary, there was evidence from which the jury could reasonably have concluded that Stewart did nothing to provoke defendant and that defendant killed Stewart with premeditation and deliberation. We therefore reject defendant's argument that there was no evidence to support the instruction that premeditation and deliberation could be inferred from "lack of provocation by the victim." We further conclude that there was competent evidence from which the jury could infer a lack of provocation by the victim and therefore, the State was not relieved of its burden of proving every element of the crime beyond a reasonable doubt. We find no error in the trial court's instruction and, consequently, no plain error.

[11] In another assignment of error, defendant contends that the trial court erred in instructing the jury on the definition of malice. The trial court instructed the jury in accord with the North Carolina Pattern Jury Instruction, N.C.P.I.—Crim. 206.11, as follows:

> Malice means not only hatred, ill-will or spite, as it is ordinarily understood to be sure; that is malice, but it also means the condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict serious injury upon another, which proximately results in her death without just cause, excuse, or justification; or *to act wantonly in such a manner as to manifest depravity of mind or a heart devoid*

*of a sense of social duty and a callous disregard for life.* (Emphasis added.)

The trial court rejected defendant's request to charge in accord with N.C.P.I. — Crim. 206.10 which does not include the emphasized portion of the instruction.

Defendant argues that the emphasized portion of the instruction should not have been given since it permitted the jury to find the element of malice based on a theory not supported by the evidence and created the possibility that the jury considered defendant's burning of the victim's body as evidence of depravity of mind. We reject this argument for two reasons: First, evidence of the numerous stab wounds, including a fatal wound to the head, in conjunction with strangulation support the definition of malice in this instruction. Secondly, the trial court specifically instructed the jury to consider defendant's actions before and after the murder with regard to premeditation and deliberation. No such instruction was given as to the element of malice.

Defendant also argues that this Court's decision in *State v. Bush*, 307 N.C. 152, 297 S.E.2d 563 (1982), should be reconsidered based on a new standard for the analysis of the constitutionality of jury instructions articulated by the United States Supreme Court in *Francis v. Franklin*, 471 U.S. 307, 85 L. Ed. 2d 344 (1985). In *Bush* an erroneous malice instruction was found harmless because the jury arrived at its verdict in reliance upon the correct premeditation and deliberation instruction untainted by the malice instruction. Since we find no error in the instruction given in the instant case, we do not reach defendant's argument for reconsideration of our decision in *Bush*.

[12] In another assignment of error, defendant contends that the trial court committed plain error by instructing the jury that it could return a verdict of guilty of voluntary manslaughter based on a defense of imperfect self-defense only if defendant reasonably believed it was necessary to kill in self-defense. Defendant acknowledges that this issue was recently decided contrary to his position in *State v. McAvoy*, 331 N.C. 583, 417 S.E.2d 489 (1992). *See also State v. Maynor*, 331 N.C. 695, 417 S.E.2d 453 (1992) (trial court did not err in failing to instruct the jury that it should find that the defendant acted in the exercise of imperfect self-defense if it found that he killed due to an honest but unreasonable belief that it was necessary to save himself from imminent or

great bodily harm). Although defendant voiced no objection to this instruction at trial, he now asks this Court to reconsider its decision in *McAvoy* and to grant a new trial on this basis. We decline to do so. In any event, any error in the instruction on voluntary manslaughter would not afford relief to defendant under the plain error rule since the jury rejected both voluntary manslaughter and second-degree murder in finding defendant guilty of murder in the first degree. *See State v. Hardison*, 326 N.C. 646, 392 S.E.2d 364 (1990) (no prejudicial error in failing to instruct on voluntary manslaughter where jury was instructed on second-degree murder but found defendant guilty of first-degree murder).

[13] In another assignment of error, defendant contends that the trial court erred in failing to grant a new trial, order a sentencing hearing before a new jury, or at least conduct a *voir dire* of the jury after it returned a verdict of guilty of first degree murder in only ten minutes. When the jury returned with its verdict of guilty, defendant moved to set aside the verdict and this motion was denied. Defendant also made a motion that a different jury be impaneled for the sentencing phase and this motion was also denied. Finally, defendant moved that the court conduct a new *voir dire* of the jury to determine if the jurors could exclude from consideration the photographic evidence of burning in reaching their verdict as to punishment. This motion was denied.

Defendant acknowledges that this Court has previously held that the brevity of a jury's deliberation does not entitle a criminal defendant to a new trial on the grounds of juror misconduct. *State v. Spangler*, 314 N.C. 374, 333 S.E.2d 722 (1985). In *Spangler* we said

> that shortness of time in deliberating a verdict in a criminal case, in and of itself, simply does not constitute grounds for setting aside a verdict. The brevity of deliberation should only be questioned if there is evidence of some misconduct on the part of the jury or the trial judge believes that the jury acted with a contemptuous or flagrant disregard of its duties in considering the matters submitted to it for decision.

*Id.* at 388, 333 S.E.2d at 731. Defendant contends that there are additional factors present here that were not present in *Spangler*. He points to the admission of "gruesome autopsy photographs," and the failure of the judge to empanel a new jury or to determine the jurors' ability to consider the remaining issues free of taint from their exposure to the autopsy photographs.

First, we have already determined that the autopsy photographs were properly admitted into evidence during the guilt-innocence phase of the trial. Since this evidence was competent for the jury's consideration during the sentencing phase, N.C.G.S. § 15A-2000(a)(3) (1988), it would not have been proper to conduct a *voir dire* to determine the jury's ability to ignore this evidence during sentencing. Further, "[u]nder N.C.G.S. § 15A-2000, it is intended that the same jury should hear both phases of the trial unless the original jury is unable to reconvene." *State v. Holden*, 321 N.C. 125, 132, 362 S.E.2d 513, 520 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Defendant does not contend that this jury was unable to reconvene for the sentencing phase.

Defendant has demonstrated no conduct on the part of the jury that would warrant questioning the brevity of the deliberations in this case. The trial court did not err in denying defendant's motions that a new jury be impaneled or that a *voir dire* be conducted of the jury. Accordingly, this assignment of error is rejected.

[14]  In another assignment of error, defendant contends that his constitutional rights were violated when the trial court granted the State's challenges for cause of jurors because of their belief in opposing the death penalty. Defendant acknowledges that this issue has previously been decided against him. *State v. Cummings*, 326 N.C. 298, 389 S.E.2d 66 (1990); *Holden*, 321 N.C. at 133, 362 S.E.2d at 520. Defendant has presented no compelling reason why we should re-examine this issue. Thus, this assignment of error is rejected.

[15]  Defendant's final assignment of error from the guilt-innocence phase is that the trial court erred in denying his motion to suppress evidence of statements made by him to law enforcement officers because these statements were made in violation of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the North Carolina Constitution. Defendant contends that: (1) these statements were made after he was illegally seized by law enforcement officers without probable cause, (2) he was not advised of his *Miranda* rights, (3) he was coerced into accompanying officers and submitting to a custodial interrogation, and (4) his mother was acting as an agent of the State to elicit his confession and her coercive effect was improper. The State contends that defendant was not in custody until the time of his arrest and that subsequent to that arrest

he was fully advised of his *Miranda* rights and elected to waive them. The State further contends that defendant's mother voluntarily came to Graham County out of concern for her son and that she was not acting as an agent of the State. We find no error.

"Only when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16 (1968). In assessing whether someone has been seized for purposes of the Fourth Amendment, the salient question is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, *reh'g denied*, 448 U.S. 908, 65 L. Ed. 2d 1138 (1980); *State v. Johnson*, 317 N.C. 343, 360, 346 S.E.2d 596, 606 (1986). Defendant argues that, under the circumstances of the instant case, a reasonable person would not have believed he was free to leave. "What the circumstances are is a question of fact to be decided by the trial court. How these circumstances would be viewed by a reasonable person is a question of law fully reviewable by an appellate court." *State v. Bromfield*, 332 N.C. 24, 33, 418 S.E.2d 491, 496 (1992).

The trial judge conducted a lengthy hearing on defendant's motion to suppress and made detailed findings of fact concerning the several interviews defendant had with various law enforcement and investigative officers. Based on these findings, the trial court concluded that "none of the constitutional rights of the defendant, either federal or state, were violated by his arrest, detention, interrogation or any statement that he made." The court further concluded that "there were no promises of reward" nor "threat or suggested threat of violence to persuade or induce the defendant to make the statement." The court also concluded that defendant's statement of 15 January 1991 "was made freely, voluntarily, and understandingly" and that "he was in full understanding of his constitutional rights" which he "agreed freely and voluntarily to waive."

We agree with the State that there was ample evidence in the record to support the trial court's findings of fact and that the findings support the conclusions of law. A trial court's findings of fact are binding on appeal when supported by competent evidence. *State v. Ross*, 329 N.C. 108, 123, 405 S.E.2d 158, 166 (1991).

STATE v. ROSE

[335 N.C. 301 (1994)]

In the instant case, the evidence shows that the defendant agreed to talk with law enforcement officers, including agreeing to come to the Sheriff's Department on several occasions, and on 13 January agreeing to go to Asheville for the polygraph examination. Defendant was repeatedly told he was not under arrest and was free to leave at any time. At no time was the defendant handcuffed, nor was his freedom restrained. On several occasions defendant indicated that he wanted to leave and he was allowed to leave or was in fact taken home by law enforcement officers. Defendant testified that when he had asked the officers to leave his apartment on one occasion, they had done so. Defendant also acknowledged that from prior experience he knew what his rights were and that he had knowingly waived them. Given these circumstances, we cannot say that a reasonable person would have believed he was not free to leave and therefore we conclude that defendant was not seized for Fourth Amendment purposes. *See Bromfield*, 332 N.C. at 37, 418 S.E.2d at 498 (no seizure where defendant agreed to accompany officers to the police station, was not handcuffed, was told there were no charges against him and he was free to go, went unescorted to the snack bar and restrooms, and acknowledged that based upon prior experiences, he could not be coerced into talking with officers); *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (no seizure where defendant agreed to accompany officers to the police station, was not frisked, was given cigarettes and coffee, was allowed to go unescorted to the bathroom and to make telephone calls).

*Miranda* warnings are required prior to questioning only if one is in custody or has been deprived of one's freedom of action in a significant way. *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706 (1966); *State v. Perry*, 298 N.C. 502, 506, 259 S.E.2d 496, 499 (1979). The test for whether a person is in custody for *Miranda* purposes is whether a reasonable person in the suspect's position would feel free to leave or compelled to stay. *State v. Torres*, 330 N.C. 517, 412 S.E.2d 20 (1992). In determining that the defendant was not seized for Fourth Amendment purposes, we have already concluded that under the circumstances of this case a reasonable person in defendant's position would have believed he was free to leave up until the time he was arrested. Likewise, we hold that the trial court's findings of fact support the conclusion that defendant was not in custody at the time of his prearrest statements to law enforcement officers. Thus, *Miranda*

warnings were not required and there was no error in denying defendant's motion to suppress on this basis. *State v. Phipps*, 331 N.C. 427, 418 S.E.2d 178 (1992) (defendant not in custody when he went to police station on his own, was permitted to return home and later agreed to take a polygraph test); *State v. Martin*, 294 N.C. 702, 242 S.E.2d 762 (1978) (defendant not in custody when he voluntarily went to the police station and made a statement and police officers returned him to his home afterwards).

Finally, as to the voluntariness of defendant's statements, we conclude that the trial court's findings support the conclusion that there were "no promises of reward or inducements" nor "threat or suggested threat of violence to persuade or induce the defendant to make the statement." There is also substantial evidence to support the finding that defendant's mother voluntarily came to Graham County and that she was not acting as an agent of the State. We thus find no error and no violation of defendant's constitutional rights in the denial of defendant's motion to suppress the statements made by him to the law enforcement officers.

SENTENCING PHASE

[16] In his first assignment of error from the sentencing phase of the trial, defendant contends that the trial court erred in admitting hearsay statements of the victim of an attempted rape at a trial held in Mississippi. Defendant testified during the guilt-innocence phase that he was convicted of attempted rape in Mississippi and on direct examination by his attorney described some of the testimony of the rape victim as follows:

Q: You heard her testify, didn't you?

A: Yes sir.

Q: Where did she testify that this assault took place?

A: Supposedly took place at her house.

Q: Had you ever been in her house?

A: Never.

Q: Did you hear her testify at the hearing with respect to how you appeared at that time, the length of your hair and so forth and beard?

A: She described a long greasy haired guy with a full beard, which was not me.

. . . .

Q: State whether or not you were represented by an attorney?

A: Yes, I was.

Defendant further testified that he did not actually commit that offense and on cross-examination testified further as follows:

Q: Mr. Rose, you heard your attorney ask if you were convicted of an assault of Hilda Jones, did you not hear that?

A: Yes, I did.

Q: And you were actually convicted of the attempted rape of Hilda Jones?

A: That was the charge, yes sir.

Q: And you were present at the trial?

A: Yes sir.

Q: You had an attorney?

A: Yes sir.

Q: And you heard Hilda Jones testify against you?

A: Yes I did.

Q: She testified that you grabbed her around her shoulders, isn't that correct?

A: That's correct.

Q: That you were holding a knife to her throat?

Mr. Buchanan: Objection.

The Court: Overruled.

A: That's what she said, yes.

Q: And that you threatened to cut her throat during this attempted rape?

Mr. Buchanan: Objection.

The Court: Overruled.

A: I don't recall those exact words, but they were very similar to that.

Q: Very close to it?

A: Yes.

Defendant argues that the statements made by Hilda Jones were inadmissible hearsay. The State does not dispute that this testimony was hearsay, but argues, *inter alia*, that defendant opened the door to cross-examination questions on the testimony of Hilda Jones.

The phrase "opening the door" refers to the principle that "[w]here one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." *State v. Garner*, 330 N.C. 273, 290, 410 S.E.2d 861, 870 (1991) (quoting *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981)). Thus, where the defendant misstates or otherwise uses his criminal record to create inferences favorable to himself, the prosecutor may properly cross-examine on the details of these prior crimes. *State v. Lynch*, 334 N.C. 402, 412, 432 S.E.2d 349, 354 (1993).

In the instant case, defendant admitted that he was convicted of attempted rape in Mississippi, but denied that he committed the offense. In response to questions by his attorney, defendant related parts of the testimony of the prosecuting witness at his trial in Mississippi. The parts of the prosecuting witness' testimony that defendant chose to testify about were clearly selected to create the inference that defendant was not the assailant in that crime. Defendant having presented an incomplete statement of the witness' testimony, including only those portions favorable to himself, the prosecution was properly allowed to cross-examine defendant on the omitted portions of the witness' testimony. *Cf. id.* at 413, 432 S.E.2d at 354 (where defendant's summary of his criminal record was accurate and complete and he did not use it to create inferences favorable to himself, he did not open the door to questions about the details of his prior crimes).

We further note that this result is consistent with well-established principles regarding the scope of cross-examination in general. As we stated in *State v. Warren*:

**STATE v. ROSE**

[335 N.C. 301 (1994)]

> Generally, much latitude is given counsel on cross-examination
> to test matters related by a witness on direct examination.
> *State v. Burgin*, 313 N.C. 404, 329 S.E.2d 653 (1985). The scope
> of cross-examination is subject to two limitations: (1) the discre-
> tion of the trial court; and (2) the questions offered must be
> asked in good faith. *State v. Dawson*, 302 N.C. 581, 585, 276
> S.E.2d 348, 351 (1981).

*Warren*, 327 N.C. 364, 373, 395 S.E.2d 116, 121-22 (1990). Here,
the questions offered appeared to be asked in good faith and the
trial court did not abuse its discretion in permitting defendant
to answer them on cross-examination.

[17] By another assignment of error defendant contends that the
trial court erred in submitting to the jury aggravating circumstance
N.C.G.S. § 15A-2000(e)(3), that "[t]he defendant had been previously
convicted of a felony involving the use or threat of violence to
the person." Defendant contends that the evidence was insufficient
to support submitting this circumstance. We disagree. We note
first that defendant admitted that he had been convicted of at-
tempted rape in Mississippi. Defendant also admitted, without ob-
jection, that the prosecuting witness testified that defendant grabbed
her around the shoulders. We have also held that it was not error
to admit defendant's admission, on cross-examination, that the pros-
ecuting witness testified that defendant threatened to cut her throat
at the time of the attempted rape. Nevertheless, we consider de-
fendant's argument that the certified records from the Mississippi
court were insufficient to support submitting the (e)(3) aggravating
circumstance to the jury.

In a capital case, the State must present evidence sufficient
to prove an aggravating circumstance beyond a reasonable doubt.
*State v. Johnson*, 298 N.C. 47, 75, 257 S.E.2d 597, 617 (1979); N.C.G.S.
§ 15A-2000(c)(1) (1988). N.C.G.S. § 15A-2000(e)(3) "requires that there
be evidence that (1) defendant had been convicted of a felony,
that (2) the felony for which defendant was convicted involved
the 'use or threat of violence to the person,' and that (3) the conduct
upon which this conviction was based was conduct which occurred
prior to the events out of which the capital felony charge arose."
*State v. Goodman*, 298 N.C. 1, 22, 257 S.E.2d 569, 583 (1979). A
prior felony under this section "can be either one which has as
an element the involvement of the use or threat of violence to
the person, such as rape or armed robbery or a felony which does

not have the use or threat of violence to the person as an element, but the use or threat of violence to the person was involved in its commission." *State v. McDougall*, 308 N.C. 1, 18, 301 S.E.2d 308, 318, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983). When the prior felony is one which "on its face, . . . involves the threat or use of violence to the person," the State is not required to show that the threat or use of violence was actually involved in commission of the felony. *State v. Hamlette*, 302 N.C. 490, 503-04, 276 S.E.2d 338, 347 (1981). *See also Goodman*, 298 N.C. at 23, 257 S.E.2d at 584 (defendant's stipulation to armed robbery conviction sufficient because "armed robbery, by definition, involves the use or threat of violence to the person of the victim").

In determining the sufficiency of the evidence to submit an aggravating circumstance to the jury, the trial court must use the same standard applied in considering a motion to dismiss. *State v. Gaines*, 332 N.C. 461, 421 S.E.2d 569 (1992), *cert. denied*, --- U.S. ---, 123 L. Ed. 2d 486 (1993). That is, the evidence must be considered in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Stanley*, 310 N.C. 332, 312 S.E.2d 393 (1984).

In the present case, the State offered, as evidence of the (e)(3) aggravating circumstance, certified court records showing that defendant was convicted of attempted rape in Mississippi in 1978, and copies of the pertinent General Laws of Mississippi. These records provide sufficient evidence that the defendant had been convicted of a felony and that the conduct upon which this conviction was based was conduct which occurred prior to the events out of which the capital felony charge arose. For reasons stated herein, we also conclude that these documents provide sufficient evidence that the felony for which defendant was convicted involved the use or threat of violence to the person. In order to reach this conclusion based on the certified court records alone, we must determine that the felony of attempted rape under Mississippi law "has as an element the involvement of the use or threat of violence to the person." *McDougall*, 308 N.C. at 18, 301 S.E.2d at 319.

Under Mississippi law, "[e]very person who shall forcibly ravish any person of the age of fourteen (14) years or upward" is guilty of rape. Miss. Code Ann. § 97-3-65(2) (1992). "The crime of attempt consists of three elements: 1) an intent to commit a particular crime, 2) a direct ineffectual act done toward its commission, and

STATE v. ROSE

[335 N.C. 301 (1994)]

3) failure to consummate its commission." *Pruitt v. State*, 528 So. 2d 828 (Miss. Sup. Ct. 1988).

Under the Mississippi statute, rape, by definition, involves the use or threat of violence to the person since an element of the offense is forcible ravishment. This Court has likewise held that rape is a crime of violence as a matter of law. *State v. Artis*, 325 N.C. 278, 321, 384 S.E.2d 470, 494 (1989), *sentence vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). We find no Mississippi case law which has addressed the issue of whether attempted rape is also a crime involving the use or threat of violence. After careful review of Mississippi law regarding rape and attempt we conclude that attempted rape is a crime involving the use or threat of violence since a conviction for attempted rape requires a direct act towards forcible ravishment. Such a direct act towards commission of a crime involving use or threat of violence necessarily involves at least a threat of violence. Thus, a conviction for attempted rape under Mississippi law is a conviction of a felony involving the "use or threat of violence to the person" within the meaning of N.C.G.S. § 15A-2000(e)(3).

Since we conclude that the State presented sufficient evidence of the (e)(3) aggravating circumstance through certified records of defendant's conviction for attempted rape, it is not necessary to address whether the State presented sufficient evidence that this particular attempted rape involved the use or threat of violence. *See State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450 (1981).

[18] In another assignment of error, defendant contends that the trial court erred by peremptorily instructing the jury that if it found defendant had committed attempted rape this would constitute a crime within the meaning of N.C.G.S. § 15A-2000(e)(3). The trial court instructed on the (e)(3) aggravating circumstance in pertinent part as follows:

Has the defendant been previously convicted of a felony involving the use or threatened use of violence to the person?

Attempted rape is by definition a felony involving the use or threatened use of violence to the person.

Defendant objected at trial to the characterization of attempted rape as a per se crime of violence. Relying on his earlier argument that attempted rape under the law of Mississippi does not necessari-

ly involve the use or threat of violence, defendant contends that this instruction eliminated the State's burden of proving that the crime of which defendant was convicted involved the use or threat of violence. As we have determined that attempted rape under Mississippi law is a crime involving the use or threat of violence, we conclude that the trial court did not err in instructing the jury accordingly.

[19] In another assignment of error, defendant contends the trial court's instructions erroneously allowed the jury to consider a possible attempted rape of Patricia Stewart, the murder victim in the instant case, as an aggravating circumstance. The trial court instructed on the (e)(3) aggravating circumstance in pertinent part as follows:

> If you find from the evidence and beyond a reasonable doubt that on or about the alleged date, the defendant had been convicted of attempted rape and that the defendant used or threatened to use violence to the person in order to accomplish his criminal act and that the defendant killed Patricia Stewart after he committed attempted rape, you would find this aggravating circumstance . . . .

Defendant did not object to this instruction at trial and therefore asserts plain error. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). Defendant contends that the instruction might have been misunderstood by the jury as meaning that if defendant had attempted to rape Patricia Stewart prior to killing her, that attempted rape could be considered a prior felony involving the threat or use of violence. Defendant bases his argument on the emphasis the prosecutor placed, during closing argument, on the State's theory that Stewart and defendant had no prior relationship and that defendant killed Stewart during a rape attempt.

The prosecutor's argument defendant refers to was made at the close of the guilt-innocence phase of the trial. In the sentencing phase closing argument, the prosecutor made it very clear that submission of the (e)(3) aggravating circumstance was based on defendant's Mississippi conviction for the attempted rape of Hilda Jones. The trial court instructed the jury that in order to find this aggravating circumstance it had to find that defendant had been *convicted* of attempted rape and that such conviction had to be "based on conduct which occurred before the events out of which this murder arose." We are convinced that the jury did

not misunderstand the court's instructions. Defendant has failed to demonstrate any error in this instruction, let alone any that rises to the level of plain error.

[20]   In another assignment of error, defendant contends that the trial court erred in submitting the § 15A-2000(e)(9) aggravating circumstance because the evidence was insufficient to support a jury verdict that the killing was especially heinous, atrocious or cruel. We disagree.

In determining the sufficiency of the evidence to support this circumstance, the trial court must consider the evidence in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn from the evidence. *State v. Gibbs*, 335 N.C. 1, 436 S.E.2d 321 (1993). The propriety of submitting this aggravating circumstance turns on the particular facts surrounding the capital offense being considered. *Stanley*, 310 N.C. at 335, 312 S.E.2d at 395.

> [T]o submit this [aggravating circumstance] to a jury, the capital offense must not be *merely* heinous, atrocious, or cruel; it must be *especially* heinous, atrocious, or cruel. The defendant's acts must be characterized by '*excessive* brutality, or physical pain, psychological suffering, or dehumanizing aspects *not normally present*' in a first degree murder case.

*Id.* at .336, 312 S.E.2d at 396, quoting *State v. Blackwelder*, 309 N.C. 410, 414, 306 S.E.2d 783, 786 (1983); *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds*, 321 N.C. 570, 364 S.E.2d 373 (1988). It is not "inappropriate in any case to measure the brutality of the crime by the extent of the physical mutilation of the body of the deceased or surviving victim." *Blackwelder*, 309 N.C. at 415, 306 S.E.2d at 787. We have also interpreted this aggravating circumstance as directed at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *Goodman*, 298 N.C. at 25, 257 S.E.2d at 585.

In the present case, the evidence, taken in the light most favorable to the State, tended to show an extremely brutal attack consisting of multiple stab wounds to the body as well as manual strangulation, either of which could have caused death. Defendant somehow gained access to the victim's apartment very late at night after the victim's girlfriend had left and the victim was alone.

**STATE v. ROSE**

[335 N.C. 301 (1994)]

Using the knife he had brought with him, defendant inflicted stab wounds on the victim's right eyebrow and her knee and slit her abdomen for five inches. Using the knife or some other blunt instrument, defendant inflicted another wound below the left breast causing puckering of the skin and discoloration. Defendant stabbed the victim in the head with such force that he fractured the front side of the skull, caused hemorrhaging to the brain beneath the stab wound, and chipping of a bone at the base of the skull. The pathologist's testimony indicated that the victim would have remained conscious while defendant inflicted the lesser knife wounds on her body, and could have remained so after the blow to the head. Finally, defendant strangled the victim, taking between four and five minutes to choke her to death. We conclude that there was sufficient evidence to warrant submission of this aggravating circumstance to the jury.

[21] Defendant next contends the trial court erred in instructing the jury on the especially heinous, atrocious, or cruel circumstance because the instruction was unconstitutionally vague under the Eighth Amendment. The court instructed the jury as follows:

2. Was this murder especially heinous, atrocious or cruel?

Every murder is, at least arguably, heinous, atrocious and cruel. In addition, this aggravating circumstance is limited to acts done during the commission of the murder and any act after the murder, regardless of how heinous or shocking, may not be considered.

You shall not consider the burning of the deceased as an especially heinous, atrocious or cruel factor, because it occurred after the death of the victim. It could not indicate that the defendant enjoyed or was indifferent to the suffering of the deceased.

In this context heinous means wicked, extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.

However, it is not enough that this murder be heinous, atrocious and cruel as those terms have been defined. This murder must have been especially heinous, atrocious and cruel, and not every murder is especially so. For this murder to

have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing, or this murder must have been a conscienceless or pitiless crime which was unnecessarily tortuous [sic] to the victim.

Defendant acknowledges that this Court recently rejected a similar challenge to our pattern jury instruction on this aggravating circumstance. *State v. Syriani*, 333 N.C. 350, 391-92, 428 S.E.2d 118, 141, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993). Defendant nevertheless contends that the instruction given in the present case vested "standardless discretion" in the jury and violated the Eighth and Fourteenth Amendments.

Defendant relies on *Smith v. Dixon*, 766 F. Supp. 1370 (E.D.N.C. 1991), *aff'd*, 996 F.2d 667 (4th Cir. 1993), *rev'd*, No. 91-4011 (4th Cir. January 21, 1994) (*en banc*). In *Smith*, the Fourth Circuit Court of Appeals affirmed the district court's holding that the heinous, atrocious or cruel instruction was unconstitutionally vague and that this Court did not cure the vagueness error by reweighing the evidence or conducting a constitutional harmless-error analysis.[1] However, the Fourth Circuit, sitting *en banc*, has since reversed this decision and, applying a harmless-error analysis, concluded that the vagueness error in *Smith* was harmless. *Smith v. Dixon*, No. 91-4011, slip op. at 41. Further, *Smith* is not helpful here since a different jury instruction was given in the present case than was given in *Smith*. The instruction given in the present case incorporated the constitutionally narrowing definition specifically referred to by the Fourth Circuit as having not been given or applied in *Smith, Id.* at 40; *State v. Martin*, 303 N.C. 246, 254-55, 278 S.E.2d 214, 220, *cert. denied*, 454 U.S. 933, 70 L. Ed. 2d 240, *reh'g denied*, 454 U.S. 1117, 70 L. Ed. 2d 655 (1981) ("brutality in excess of that which is normally present in any killing" and "conscienceless or pitiless crime which is unnecessarily torturous to the victim"), and includes the identical language found to be constitutionally sufficient in *Syriani*. *Syriani*, 333 N.C. at 391-92, 428 S.E.2d at 140-41. This assignment of error is therefore rejected.

---

1. The defendant in *Smith* raised this issue for the first time in a federal habeas corpus petition. The vagueness error was not raised and therefore not specifically reviewed by this Court in Smith's direct appeal. 305 N.C. 691, 292 S.E.2d 264 (1982).

STATE v. ROSE

[335 N.C. 301 (1994)]

[22] In his next assignment of error defendant contends that the trial court erred by not fully responding to a request by the jury for reinstruction regarding mitigating circumstances. During the sentencing phase charge, the trial court instructed the jury on Issue Two in accordance with the North Carolina Pattern Jury Instructions. During deliberations, the jury requested further instruction by submitting to the court the question, "Could we have in writing the wording of mitigating circumstance and/or value or weight?" In response the court repeated its instructions on Issue Two which places the burden on the defendant to prove by a preponderance of the evidence the existence of mitigating circumstances. Defendant argues that the court should have also repeated the instructions on Issue Three regarding the State's burden to prove aggravating circumstances and the weighing of aggravating and mitigating circumstances. Defendant further argues that the instruction on Issue Two, in accord with the pattern jury instruction, is constitutionally deficient.

We first note that since defendant did not object to the reinstruction or the manner in which the trial court handled the jury's question, this assignment of error must be assessed under the plain error rule. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). In response to the written inquiry by the jury, the trial court repeated a portion of the instruction it had previously given for Issue Two. The court further informed the jury that if this was not sufficient, the jury should submit another request in writing which the court would take up at the appropriate time. Defendant made no objection to the court's handling of the request. The jury resumed its deliberations and made no further request for reinstruction. It seems clear that, contrary to defendant's assertions, the jury understood the trial court's reinstruction and gave it proper application, since although it declined to find any of the three submitted statutory mitigating circumstances, it did find all nine of the submitted nonstatutory mitigating circumstances.

[23] With regards to the constitutionality of the pattern jury instruction on Issue Two, defendant acknowledges that this Court has repeatedly decided this issue contrary to his position. *State v. Hill*, 331 N.C. 387, 417-18, 417 S.E.2d 765, 780 (1992), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 684 (1993); *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990), *on remand*, 328 N.C. 532, 402 S.E.2d 577 (1991); *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518 (1988),

*vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand,* 329 N.C. 233, 404 S.E.2d 842 (1991). Defendant has presented no new arguments that warrant our reconsideration of this issue. Therefore, this assignment of error is rejected.

[24] Defendant next contends that the North Carolina Pattern Jury Instruction imposing a "duty" upon the jury to return a recommendation of death if it finds the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the death penalty is unconstitutional. Defendant acknowledges that this Court has previously decided this issue contrary to his position. *State v. Pinch,* 306 N.C. 1, 292 S.E.2d 203, *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled in part,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. McDougall,* 308 N.C. 1, 301 S.E.2d 308, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 173 (1983). Defendant raises no new arguments which warrant reconsideration of our prior holdings. This assignment of error is therefore rejected.

[25] In another assignment of error defendant contends that the trial court erred by instructing the jury that it could consider all of the evidence received during the guilt phase on the sentencing issues. At the beginning of the sentencing phase charge, the trial court instructed the jury as follows:

> All of the evidence relevant to your recommendation has been presented. There is no requirement to resubmit, during the sentencing proceeding, any evidence which was submitted during the guilt phase of this case.

> All of the evidence which you hear in both phases of the case is competent for your consideration in recommending punishment.

> It is now your duty to decide from all of the evidence presented in both phases what the facts are.

Defendant made a written request for an instruction emphasizing that evidence of defendant's conduct after the murder not be considered by the jury "in the sentencing hearing for any purpose." Instead the court instructed the jury as follows:

> You shall not consider the burning of the deceased as an especially heinous, atrocious or cruel factor, because it occurred after

the death of the victim. It could not indicate that the defendant enjoyed or was indifferent to the suffering of the deceased.

Defendant contends that these instructions were erroneous because: (1) they are contradictory in that they first tell the jury that it can consider all of the guilt phase evidence during the sentencing phase and then that it is not to consider some of the evidence from the guilt phase; (2) they limit the instruction to not consider the burning evidence to the jury's consideration of the "especially heinous, atrocious or cruel" aggravating circumstance; and (3) taken together, the instructions tell the jury that it can consider the evidence of burning of the body in deciding Issues Two, Three, and Four. We find no reversible error.

When taken as a whole, the instructions are not contradictory. The trial court began its sentencing phase charge with general instructions regarding, *inter alia*, the evidence the jury would be allowed to consider on sentencing. After providing other general instructions, the court gave specific instructions for each of the two aggravating circumstances, including the instruction that evidence of burning of the body after the murder should not be considered as an especially heinous, atrocious or cruel factor.

Evidence of defendant's conduct after the murder, including burning and burying the body, was properly admitted into evidence during the guilt-innocence phase. At sentencing, the jury is properly permitted to consider the evidence presented at the guilt-innocence phase. N.C.G.S. § 15A-2000(a)(3) (1988); *Syriani*, 333 N.C. at 396, 428 S.E.2d at 143. It was therefore not error for the trial court to instruct the jury that it could consider all of the evidence presented at both phases of the trial except with regards to the "especially heinous, atrocious or cruel" aggravating circumstance. This assignment of error is therefore rejected.

PROPORTIONALITY

[26] Having found no prejudicial error in the trial and sentencing phases of this case, we are required by statute to review the judgment and sentence to determine whether: (1) the record supports the jury's finding the aggravating circumstances on which the court based its sentence of death, (2) the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (3) the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime

and defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. Gibbs*, 335 N.C. 1, 436 S.E.2d 321 (1993).

In this case, the jury found the two aggravating circumstances which were submitted: "[h]ad the defendant been previously convicted of a felony involving the (use) (threat) of violence to the person?" and "was this murder especially heinous, atrocious or cruel?" We have held that the evidence supports the jury's finding of each of these aggravating circumstances. We also conclude that there is nothing in the record that suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review.

In conducting proportionality review, "[we] determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Brown*, 315 N.C. 40, 70, 337 S.E.2d 808, 829 (1985). We compare similar cases in a pool consisting of:

> all cases arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993) (quoting *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983) ).

The proportionality pool includes only those cases found to be free of error in both phases of the trial. *State v. Jackson*, 309 N.C. 26, 45, 305 S.E.2d 703, 717 (1983). However, this Court is not required to give a citation to every case in the pool of similar cases used for comparison. *State v. Williams*, 308 N.C. at 81, 301 S.E.2d at 356. The Court's consideration of cases in the pool focuses on those cases "which are roughly similar with regard to the crime and the defendant . . . ." *Syriani*, 333 N.C. at 401, 428 S.E.2d at 146 (quoting *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985) ).

STATE v. ROSE

[335 N.C. 301 (1994)]

In the present case defendant attacked his neighbor who was at home alone late at night. Defendant inflicted numerous stab wounds including one potentially fatal wound to the head, and followed this with manual strangulation. He then removed the victim's body and stored it in the trunk of his car until the next evening when he transferred it to another car, took it to his grandmother's farm, burned and buried it.

The jury found the two aggravating circumstances, that defendant had been previously convicted of a felony involving the use or threat of violence to the person and that the murder was especially heinous, atrocious or cruel. The jury found none of the three statutory mitigating circumstances submitted, but did find all nine of the non-statutory mitigating circumstances. Those circumstances were: (1) defendant is the product of a broken home; (2) defendant was reared until at least his twelfth birthday in the home of his father and mother, the father being a chronic alcoholic who was abusive both physically and mentally to defendant's mother in the presence of defendant; (3) defendant received an honorable discharge from the United States Army; (4) defendant received an honorable discharge from the United States Marine Corps; (5) defendant was a good and obedient prisoner in the Graham County Jail for fifteen months, and at no time caused any problem with the jailor or other personnel of the Sheriff's Department or with any other inmates confined there; (6) defendant was a good and obedient prisoner in Haywood County Jail for twelve days, and at no time caused any problem with the jailor or other personnel of the Sheriff's Department or with any other inmates; (7) defendant cooperated with the agents of the SBI and members of the Graham County Sheriff's Department when he, at their request, agreed to take and did take a polygraph test at a time when he was not in custody and was free to go and come as he pleased; (8) defendant has been a good and reliable and valuable employee of Tuckaseegee Mills for a substantial period of time prior to 1 January 1991; and (9) defendant has a good character and reputation for truth and veracity in the work community of his place of employment prior to 1 January 1991, namely the Tuckaseegee Mills work community.

Of the cases in which this Court has found the death penalty disproportionate, only two involved the "especially heinous, atrocious, or cruel" aggravating circumstance. *State v. Stokes*, 319 N.C. 1,

STATE v. ROSE

[335 N.C. 301 (1994)]

352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 653 (1987). Neither is similar to this case.

In *Stokes*, defendant and three other young men planned to rob the victim's place of business. During the robbery one of the assailants severely beat the victim about the head, killing him. *Stokes*, 319 N.C. at 3, 352 S.E.2d at 654. *Stokes* is distinguishable from the present case. First, the defendant in *Stokes* was seventeen years old; defendant in this case is thirty-two years old. Second, the defendant in *Stokes* was convicted on a felony murder theory with virtually no evidence of premeditation and deliberation, whereas in the present case, defendant was convicted on a theory of premeditation and deliberation. There was also no evidence in *Stokes* showing who was the ringleader in the robbery, or that the defendant deserved a death sentence any more than did an older confederate who received a life sentence. There was evidence that the defendant in *Stokes* suffered from impaired capacity to appreciate the criminality of his conduct and that he was under the influence of a mental or emotional disturbance at the time of the murder, neither of which is present in the instant case.

In *Bondurant*, the defendant shot the victim while they were riding together in a car. *Bondurant*, 309 N.C. at 677, 309 S.E.2d at 173. The Court "deem[ed] it important in amelioration of defendant's senseless act that immediately after he shot the victim, he exhibited a concern for [the victim's] life and remorse for his action by directing the driver of the automobile to the hospital." *Id.* at 694, 309 S.E.2d at 182. He then went inside to secure medical treatment for the victim. The defendant also spoke with the police at the hospital, confessing that he shot the victim. In the present case, by contrast, the defendant followed the infliction of one potentially fatal wound with another until the victim was dead. He then proceeded to dispose of the body by burying and burning it and for almost two weeks denied knowing anything about the victim's whereabouts.

There are also cases in the pool, similar to the present one, in which the jury recommended a sentence of death after finding as an aggravating circumstance that the murder was especially heinous, atrocious or cruel. *State v. Huffstetler*, 312 N.C. 92, 322 S.E.2d 110 (1984).

In *Huffstetler*, defendant beat his mother-in-law to death with a cast iron skillet after an argument. The victim had multiple wounds

**STATE v. ROSE**

[335 N.C. 301 (1994)]

on her head, neck and shoulders. Her jaw, neck, spine and collarbone were fractured. After beating the victim, the defendant went home to change his bloody clothes, returned to the scene to remove the skillet, and went to visit a woman friend. *Huffstetler,* 312 N.C. at 98-100, 322 S.E.2d at 115-16. The jury in *Huffstetler* found as the single aggravating circumstance that the murder was especially heinous, atrocious or cruel. *Id.* at 100, 322 S.E.2d at 116. The jury also found three mitigating circumstances: that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired; that the killing occurred contemporaneously with an argument and by means of an instrument acquired at the scene and not taken there; and that the defendant did not have a history of violent conduct. *Id.* Notwithstanding the fact that defendant suffered from an emotional or mental disorder, this Court concluded that the sentence of death was not disproportionate, based on evidence similar to that in the present case, including the brutal nature of the killing, the lack of remorse shown by the defendant, and the defendant's cool actions after the murder.

Of the cases in which this Court has found the death penalty disproportionate, none have involved the aggravating circumstance of a prior conviction of a felony involving the threat or use of violence against the person. There are two cases in which both aggravating circumstances, "especially heinous, atrocious, or cruel" and "prior conviction of a felony involving the threat or use of violence" were involved and we found the sentence of death not disproportionate. *State v. Brown,* 315 N.C. 40, 337 S.E.2d 808 (1985); *State v. Boyd,* 311 N.C. 408, 319 S.E.2d 189 (1984).

In *Boyd,* the defendant stabbed his estranged girlfriend thirty-seven times in front of her mother and her daughter at a shopping mall. After the killing, the defendant walked "slowly and inconspicuously" from the scene, removed his bloodstained shirt and attempted to conceal himself in the parking lot when police arrived. We found the death sentence not disproportionate based on "overwhelming evidence of defendant's guilt, scanty evidence of emotional or mental disorder, . . . defendant's significant history of criminal convictions and the heinous nature of the crime, including suffering of the victim." *Boyd,* 311 N.C. at 436, 319 S.E.2d at 207. Although the defendant in the present case had a less significant history of criminal convictions than did the defendant in *Boyd,* he was indeed convicted of a prior felony involving the threat

or use of violence. The other factors which formed the basis of the death penalty in *Boyd* are equally present in the instant case.

In *Brown*, the defendant robbed a convenience store and kidnapped the clerk whom he then drove to an isolated location and shot six times. Finding the death sentence not disproportionate, we noted that the defendant robbed the store during the early morning hours when the lone employee was most vulnerable and that the victim did not die immediately, but may have remained conscious for up to a quarter hour before her death. Similarly in the present case, defendant approached the victim late at night when she was alone in her own apartment. There was also evidence in this case that the victim would have remained conscious during the initial stab wounds and might have remained so after the fatal blow to the head.

> Although the presence of two of the aggravating circumstances which are most prevalent in death-affirmed cases is not in itself conclusive, it is one indication that the sentence was neither excessive nor arbitrarily imposed. The heinous, atrocious or cruel circumstance reflects upon the brutality of the crime and the suffering of the victim, while the prior violent felony circumstance reflects upon the defendant's character as a recidivist, two important factors in our consideration of the nature of the defendant and the crime.

*Artis*, 325 N.C. at 342, 384 S.E.2d at 506-07.

We further note that in this case, defendant's character, background, and mental and physical condition do not mitigate this brutal killing. Although he came from a poor, dysfunctional background, he was nevertheless able to successfully complete two tours of duty in military service, to hold down a job in the civil sector and to support a wife and children for a while. There is no evidence that defendant had any mental or physical difficulties either prior to or at the time of the murder.

After a thorough review of the transcript, record on appeal, the briefs of both parties, and the oral arguments of counsel, we find that the record fully supports the jury's written findings in aggravation in the death of the victim. We further conclude that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We hold that defendant received a fair trial and sentencing proceeding, free of

prejudicial error. After comparing this case to similar cases in the pool, we cannot hold as a matter of law that the sentence of death is disproportionate or excessive.

NO ERROR.